IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 22, 2016


**STATE OF TENNESSEE v. JAMES K. HUDGINS**


**Appeal from the Criminal Court for Knox County**
**No. 102566     Bobby R. McGee, Judge**

_____


**No. E2015-01363-CCA-R3-CD – Filed August 18, 2016**

_____


The defendant, James K. Hudgins, was convicted of one count of first degree (premeditated) murder.  On appeal, he argues that the evidence was insufficient to support his conviction; that the trial court erroneously admitted evidence of a phone call from jail; and that the trial court erred when it allowed the State to introduce evidence that the defendant had previously accused someone of molesting his daughter.  Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and TIMOTHY L. EASTER, JJ., joined.

J. Liddell Kirk (on appeal) and Bruce E. Poston (at trial), Knoxville, Tennessee, for the Appellant, James K. Hudgins.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Charme P. Allen, District Attorney General; and TaKisha Fitzgerald, Assistant District Attorney General, for the Appellee, State of Tennessee.


**OPINION**

**FACTS AND PROCEDURAL HISTORY**

This case arose after the defendant shot the unarmed victim five times at the victim's home.  Sixteen years prior to the shooting, the defendant was in a romantic

relationship with Laura Swaggerty. They had a daughter ("the daughter"), and Ms. Swaggerty ended the relationship with the defendant three months after giving birth. In December 2011, Ms. Swaggerty began dating the victim. At the time of his death, the victim, Ms. Swaggerty, the defendant's daughter, and the victim's son from a previous relationship all lived together at 321 Churchwell Avenue. The defendant's daughter testified that initially, she and the victim did not get along, but she eventually came to regard the victim as a second father. Ms. Swaggerty testified that prior to the date of the shooting, the defendant and the victim had always interacted peacefully and civilly.

On the evening of the shooting, the defendant's daughter went to her maternal grandmother's home, which was "two blocks" away from the home that the victim and Ms. Swaggerty shared. At her grandmother's house, the defendant's daughter was socializing with some of the other teenagers in the neighborhood. A woman named Brandi approached and began talking to her. After Brandi left, the daughter sent a text message to her mother saying, "[The defendant is] across the street and he's drunk. Like, swear to God." The daughter said she alerted her mother "[b]ecause she needs to know because [the defendant] can cause problems when he's drunk." Ms. Swaggerty testified that she called the daughter after receiving the text message, and she also called her mother and asked her to see if the defendant was across the street. After confirming that the defendant was there, Ms. Swaggerty and the victim went to the residence.

Shortly after 8:00 p.m., Ms. Swaggerty and the victim were standing next to the daughter when the defendant crossed the street and initiated a conversation with the daughter. The daughter testified that the defendant gave her a hug and asked her how she was doing. The defendant asked the daughter if she had plans for fall break and if she wanted to spend time with him over the break. She replied that she would if she was "able to," and the defendant asked her what she meant by that response. The daughter again answered, "If I'm able to," and the defendant asked her to speak with him in private. She told the defendant that she did not want to go with him because he was inebriated. The defendant turned to Ms. Swaggerty and asked if she would permit the daughter to "disrespect [him] like this." Ms. Swaggerty answered that she would not force her to go with the defendant if she did not want to. Ms. Swaggerty testified that the defendant appeared to be intoxicated during this conversation.

The defendant began to pull on the daughter's arm in an effort to speak with her privately. She turned to the victim and said, "Larry, please," and Ms. Swaggerty said that she "gave that look to [the victim] like please help me." The defendant turned his attention to the victim and began to insult him, saying that the victim was "nothing but a truck driver." Ms. Swaggerty testified that the victim did not respond and permitted the defendant to "keep ranting and raving." Several of the defendant's friends came over from across the street and pulled the defendant away from the confrontation. Ms.

2

Swaggerty and the daughter saw the defendant and a female companion then speed away from the scene, and the daughter believed that they left in a Ford Taurus.

The victim, Ms. Swaggerty, and the daughter remained at the scene, and the victim called police around 8:15 p.m. As they waited for police to arrive, the defendant called the victim. Ms. Swaggerty "kept hearing" the victim say, "Uh-huh. Uh-hmm. Okay. Okay. Hmm, you're going to kill me. Okay. You know where I'm at." The daughter and Ms. Swaggerty testified that during this phone call, the victim handed the daughter the phone and asked if he had ever molested her, and she told the defendant that the victim had never molested her. Ms. Swaggerty testified that this was the first time she ever heard the defendant allege that the victim was molesting the daughter, and the daughter testified that the victim had never done anything inappropriate or touched her inappropriately. She also testified that she had never told anyone that the victim sexually abused her.

Ms. Swaggerty testified that she, the victim, and the daughter remained at the daughter's grandmother's home until around 9:00 p.m. Around this time, an officer had not yet arrived and it began to rain, so the three got into the victim's truck to leave. Before they left, the victim again called police and said that he would like to make a report. The three stayed at the scene while the victim made his report, and then they started to return home. After running several errands, they arrived home at around 10:15 p.m. The daughter got ready for bed, and she went into her room to lie down.

After the confrontation in front of the daughter's maternal grandmother's home, the defendant returned to his own residence. The defendant's son, ("the son"), and the defendant's mother arrived at the defendant's residence while the defendant was on the phone with the victim. The son testified that the defendant "looked angry." The son saw the defendant on the phone, but he did not know with whom the defendant was speaking. He heard the defendant say into the telephone that the defendant "was going to kill [the person]." The defendant's mother began to talk to the defendant and asked him why he was upset. The son testified that the defendant got into the vehicle and told his mother to take him to the daughter's house "because that guy that [Ms. Swaggerty is] dating won't let me talk to her." The son testified that before the defendant got into the car, he saw the defendant go into the house. The defendant returned with a gun that was in a holster, and the son said the gun "was black" and "looked like a Glock." The defendant requested that he be taken to the daughter's house because he was "going to shoot the bastard that molested [his] daughter." The defendant placed the gun on the floorboard, and the defendant's mother left the driveway.

While they were driving, the defendant's mother indicated that she needed to use the restroom. She stopped at a Kroger grocery store and went inside, where she called

3

police regarding the defendant just before 9:00 p.m. The son remained in the van with the defendant, and he testified that the defendant told him that the defendant was "probably going to die with" the victim. The defendant told him that the house was "paid off" and that it would belong to him after the defendant's death. The defendant also said that he would give the victim "a one-way ticket to heaven," and he repeatedly told the son how much he loved him.

The defendant's mother was still in Kroger when Officer Jeremy Moses of the Knoxville Police Department ("KPD") approached the vehicle. The son testified that Officer Moses approached the driver's side window and asked why the van was parked sideways. The defendant informed Officer Moses that his mother was driving and that she was handicapped and that she had briefly gone into Kroger. Officer Moses replied that he was checking on the vehicle because there had been reports of suspicious activity. The defendant said that he was simply having a conversation with his son, and two more KPD officers arrived on the scene. The son testified that the defendant's mother returned from the store at the same time the other officers arrived on the scene. Once the defendant's mother was at the car, an officer then explained that there were reports of child molestation occurring. The son testified that the defendant replied, "Yes, my daughter's getting molested." The defendant informed the officers that his daughter was involved, and his mother provided officers with the address. The officers responded that they would go to the house to check on the daughter and that they would turn the case over to juvenile investigators the next day.

Officer Moses testified that he arrived in the parking lot at 9:12 p.m. He stated that he approached the vehicle and attempted to identify the defendant and the son, and the defendant asked Officer Moses why he was talking to him. The defendant also told Officer Moses that "everything [was] fabulous." Officer Moses replied that he received a call that a person in the van was behaving suspiciously and that he needed to identify him. Officer Moses testified that the defendant appeared to be quite intoxicated, so he asked the defendant how much he had to drink. Officer Moses did not believe that the defendant ever provided a specific amount. Officer Moses testified that during this initial conversation, the defendant never said that his daughter was being molested. Two other officers, Officer Copeland and Sergeant Shelton, arrived on the scene shortly thereafter. Officer Moses testified that he directed Officer Copeland to go into Kroger and find the person who originally called police and identify the complaint. When Officer Copeland returned to the vehicle with the defendant's mother, the officers learned that there were allegations of child molestation. Officer Moses testified that officers received information regarding the alleged molestation victim and her address. Officer Moses did not recall the specific address, but he agreed that it was on Churchwell Street. Officers left the parking lot at 9:35 p.m. and went to the address. They knocked on the doors and windows but did not receive an answer.

4

After the officers left the parking lot, the defendant's mother drove to a gas station where the son purchased soft drinks for the family. The son testified that during the drive, the defendant was telling his mother "how he let [the daughter] down and how he" did not protect her. The three eventually returned to the defendant's residence, and the son said that the defendant's mother was able to calm the defendant to the point where he was no longer crying and "looked perfectly fine." The son testified that the defendant's mother asked the defendant if he wanted the son to spend the night with him, and the defendant replied affirmatively. The defendant's mother left the residence, and the son and the defendant went inside the house.

Once they were in the home, the son sat in a chair in the living room while the defendant remained in the kitchen "just pacing." The son did not speak to the defendant because he did not want to say anything to upset the defendant. The son testified that he had never seen the defendant cry before and that he knew the defendant was emotionally fragile. Eventually, the defendant told him that they should "go riding." The defendant handed the son, who had his learner's permit, the keys, and they got into the defendant's car.

The defendant suggested to him that they go by the daughter's house to see if anyone was home. They drove by the residence, and the son said that "[t]he lights were on but it looked like nobody was there." He testified that the defendant suggested that they park the car and approach the residence to see if they could see or hear anyone in the house. The son parked on a street close to the daughter's residence, and he and the defendant walked to the house. The son testified that he did not see the defendant with a gun when they approached the house. After standing in front of the house for "[a]bout two minutes," the defendant suggested that they return to the car.

In the car, the defendant attempted to call the daughter, and the victim answered. The son testified that the defendant got upset and said, "Let me talk to my daughter now." Ms. Swaggerty also overheard the conversation. She testified that the defendant called the victim's work phone and asked to speak to the daughter. The victim informed the defendant that the daughter was sleeping and that he would not wake her to speak with the defendant. Ms. Swaggerty heard the victim say, "I'm not waking her up to talk to you. You're not in the condition, and she -- you can call her tomorrow." The victim then hung up the phone. Ms. Swaggerty testified that the defendant called back, and she again overheard the victim's portion of the conversation. She gleaned that the defendant threatened to have the victim fired, and the victim hung up the phone. The son testified that at the conclusion of the phone call, the defendant hung up the phone and said that he and the son should go visit the home. The son parked behind a truck and asked the defendant if he wanted the son to go with him, and the defendant declined.

5

Shortly after the phone call, the son saw the defendant go onto the porch, and Ms. Swaggerty heard "stomping coming up on the porch" and "banging on the glass door." Ms. Swaggerty told the victim that the defendant was at the residence, and she told the victim to call 9-1-1 and not to answer the door. The daughter heard the noise and asked her mother what was happening, and her mother told her to stay in her room. The son heard the defendant loudly say, "Let me talk to my daughter," and he did not know to whom the defendant was speaking. He testified that the defendant was "obviously mad because someone's not letting him see his daughter." Ms. Swaggerty heard the victim and the defendant arguing, and she heard the defendant say to the victim, "[Y]ou've been molesting my daughter." The daughter heard the defendant's voice, and she left her room. She testified that the defendant did not sound drunk at the time. She had her phone in her hand and was poised to dial 9-1-1. The victim was still arguing with the defendant, and the victim also had his phone in his hand and was preparing to dial 9-1-1. The daughter and Ms. Swaggerty then heard gunshots, and the son heard "five pops," which he thought were fireworks. The daughter and Ms. Swaggerty both raced outside to check on the victim, and the daughter saw that the defendant "was walking away." The daughter called 9-1-1.

Several neighbors heard the gunshot and went to provide aid to the victim. Curtis Johnson, who lived across the street from the victim, saw the victim lying across the front porch and Ms. Swaggerty and the daughter "running in the yard screaming hysterically on the phone." Mr. Johnson saw that the victim had been shot at least twice in the chest. He asked the daughter to give him the phone, and he spoke with the 9-1-1 operator. He also told the daughter and Ms. Swaggerty to go get some towels from the house, which he attempted to use to apply pressure to the victim's wounds to stop the bleeding. After several minutes, Mr. Johnson "noticed that the blood stopped flowing and [the victim] stopped breathing." Brian Rose, after hearing the "unmistakable" sound of gunfire, also came to the residence. He saw Mr. Johnson attempting to apply pressure to the victim's wounds. He remained on the scene waiting for police officers to arrive. Several officers, including Officer Moses, Officer Rebecca Newlin, and Officer Danielle Wieberg, later responded to the scene.

Meanwhile, after the shooting, the defendant returned to the car and said, "Let's go." The son and the defendant began driving, and the son testified that the defendant initially said he wanted to go to his office and finish some work. On their way, the son observed a police car with its lights and sirens flashing. The son testified that the defendant knew that the son became nervous and feared that he had done something wrong when he saw a police car. He stated that the defendant told him not "to worry about it" and to continue toward the office. When they arrived at the office, the defendant announced that he had forgotten that he had actually finished his work. The

6

two then proceeded to the interstate and were "just driving." During the ride, the defendant's phone battery died, and he told the son that they needed to go to Walmart so that the defendant could purchase a phone charger. The son and the defendant went into the store, and the defendant purchased a phone charger and soft drinks for himself and the son. When they returned to the car, the defendant directed the son to drive to the home of two of the defendant's friends, Dennis and Diane Graves. The son testified that the defendant was not drunk at the time and that he would know if the defendant was drunk. He testified that he did not see the defendant disassemble the gun and throw it into a lake.

They arrived at the Graves's home around 1:00 a.m., and the defendant told the Graves that he needed to talk to them because he "did something bad." The son testified that the defendant began crying, and the Graves invited the defendant out to the back porch while the son remained inside. Eventually, the son fell asleep, and the defendant later woke him up. He told the son that the Graves had convinced him to turn himself in. The defendant informed the son that after he surrendered, police would likely wish to speak with the son.

After the defendant turned himself in, he made several phone calls from the jail. In his first phone call, he spoke with his mother, and he did not ask about the daughter or her welfare during this call.

Dr. Christopher Lockmuller testified that the cause of the victim's death was multiple gunshot wounds. He testified that the victim was shot five times, and several of the shots appeared to have been fired from close range while others were fired from a further distance. Special Agent Steve Scott, a forensic scientist for the Tennessee Bureau of Investigation ("TBI"), examined five cartridge casings recovered from the scene. One was a Winchester .380 casing, and the other four were .40 caliber casings. He testified that the four .40 caliber casings were all fired from the same handgun, most likely a Glock or Smith & Wesson Sigma.

Lisa Knight testified that she worked for the Tennessee Department of Safety and Homeland Security in the handgun permit division. She testified that the defendant's handgun carry permit was suspended on July 9, 2012. She stated that it would have been illegal for the defendant to carry a handgun outside of his home after that date, and she explained that it was illegal for the defendant to carry a handgun outside of his home on October 16, 2013.

**Defense Proof**

Dennis Graves and the defendant testified on the defendant's behalf. Mr. Graves testified that on the day of the shooting, he spoke with the defendant twice by telephone.

7

He first spoke with the defendant in the afternoon, and he testified that the defendant sounded "[s]mashed" and "[d]runk." He said that the defendant could barely speak and had slurred speech. The defendant called Mr. Graves a second time later that evening, and Mr. Graves said that the defendant sounded even more intoxicated than he did during the first phone call.

Mr. Graves testified that the defendant and the son arrived at his home around 1:00 a.m. the morning after the shooting and that the defendant appeared upset and frustrated. The defendant began crying several moments after his arrival, and he told Mr. Graves, "I've done the most horrible thing I could. God will never forgive me. . . . I've shot a man and I think he's dead." Mr. Graves explained that the defendant was quite upset and was "[h]anging his head" when he made his admission. Mr. Graves said that the defendant had overheard a conversation between the daughter and two of her friends and learned that the victim was molesting the daughter. Based on his conversation with the defendant, Mr. Graves believed that the defendant planned to commit suicide, and he and Ms. Graves attempted to talk him out of that plan. Mr. Graves said that both the defendant and the son told him that the gun was in the water.

The defendant testified that on the date of the shooting, he went to lunch at Applebee's, where he consumed six double vodkas. He estimated that he left the restaurant around 2:00 or 3:00 p.m., and he said that he drove home drunk. Once he returned home, his friend Brandi came by his home and "wanted to go drinking," so the two went to a local pub. The defendant estimated that he had seven or eight drinks at the bar, and he testified that he "was really drunk" at the conclusion of the outing. The defendant did not recall making a second phone call to Mr. Graves because he was so intoxicated.

Brandi and the defendant left the pub, and Brandi drove the defendant's car to an address on the daughter's maternal grandmother's street so that Brandi could see a friend. When they arrived, the defendant, Brandi, and her male friend sat on the porch, where the defendant continued to consume alcohol. The defendant went across the street to talk to the daughter, who was with the victim and Ms. Swaggerty. The defendant testified that he went to talk to the daughter to see if she was going to spend some time with him during the upcoming weekend. He agreed that he was able to speak to her and that she could understand what he was saying. The defendant testified that the daughter "said that she had plans, but when she did she got this kind of smirk on her face, and she glanced over at [the victim], and he's looking back at her, and they kind of pass this look. It was weird. It just wasn't right." The defendant said that it was "not the way that [he] thought a grown man should look at a 15[-]year-old girl." The defendant asked the daughter about her plans, and she said that she had "plans with B.J." The defendant testified that she looked over at the victim and smiled while making this remark, and the defendant

8

said that they passed a "look that made the hair stand up on the back of [his] neck." The defendant felt that something was very "wrong," and he believed that the daughter was having sexual intercourse with the victim. He said that he could tell they were having sexual intercourse because "[a] father knows these things." The defendant walked back across the street "in shock." He returned to confront the victim and told the victim that he knew what the victim was doing with the daughter and that it was going to stop. The defendant told the victim that he "ain't nothing but a child molester." The victim did not respond, and Brandi and her friend approached the defendant and told him that he needed to leave because he was causing a disturbance. They led the defendant away from the scene, and Brandi then drove the defendant to his house. The defendant testified that Brandi drove his vehicle because he was too drunk to drive.

The defendant testified that he continued drinking at his residence and attempted to call the daughter. He called Ms. Swaggerty's phone, and the victim answered. The defendant said that he wanted to speak to his daughter, and the victim refused. The defendant was "screaming" and cursing at the victim, calling him a "child molester," and the defendant testified that he threatened the victim. He testified that during this phone call, the victim did not hand the phone to the daughter and ask if he had ever molested her, and he testified that the daughter never told him that the victim was not molesting her. He testified that the daughter's and Ms. Swaggerty's testimony to the contrary was incorrect.

After speaking with the victim, the defendant next called his mother and informed her that he believed that the daughter was being molested. He asked his mother if she would go attempt to speak with the daughter and remove her from the home. The defendant's mother and the son arrived at the defendant's residence, and the defendant agreed that he was still on the phone with the victim threatening to kill him when they arrived. The defendant remembered that he said to the victim, "[Y]ou low[-]life child[-]molesting bastard . . . I'll kill you," or something very similar to those words.

The defendant informed his mother that he wanted to go to the daughter's house, and they left in his mother's van. The defendant testified that he had not yet retrieved his gun when they left the house, and he said that the son's testimony to the contrary was incorrect. He also testified that the son was incorrect that he placed the gun on the floorboard of the van, that he never told the son that he was going to give the victim "a one way ticket to heaven," and that he never said his house was paid off. They stopped at Kroger, and the defendant testified that he was able to understand and respond to Officer Moses's questions. He testified that he told police officers that he believed his daughter was being molested. The defendant told officers that the victim threatened him, and the defendant testified that the threat occurred when the victim stood between the defendant and the daughter so that the defendant could not talk to her and when the victim "stuck

9

his chest out." The defendant agreed that he told Officer Moses that "[The daughter] told [him] that [the victim] was molesting her," but he stated that he made a poor choice of words because he was intoxicated. He explained that he meant that the daughter "communicated" that she was being molested. He agreed that she never told him that the victim was molesting her.

After leaving Kroger, the defendant testified that his mother drove back to his house. He stated that his mother dropped him off and asked him if he wanted the son to spend the night with him. The defendant testified that the son was incorrect in saying that the defendant's mother had calmed the defendant because he was still quite upset when he arrived home. The defendant resumed drinking alcohol upon his arrival, and he was pacing in the kitchen. He attempted to call the daughter multiple times, and the victim answered each time. The defendant demanded to speak to the daughter, and he threatened the victim and called him a child molester. The defendant testified that during the last conversation, after he accused the victim of being a child molester, the victim said, "What if I am? Prove it." At that point, the defendant decided that he was going to remove the daughter from the victim's home. He testified that he retrieved his gun off of the counter and exited the residence. He had the son drive him to the victim's house, and he recalled the precise route that they took to get to the residence, identifying all of the streets on which they traveled. He testified that they parked just beyond the house, and he said that the son's testimony that they parked a block away was incorrect. The defendant testified that he got out of the vehicle alone and that the son never got out of the car or walked around the house with him. The defendant testified that he only approached the house one time. He said that he went to the door to get the daughter, and he testified that he had a Glock .40 caliber pistol in a holster on his hip. He said that he took the gun because the victim was much larger than he was. The defendant testified that his only purpose in going to the residence was to get the daughter, and he estimated that it was 10:30 or 11:00 p.m. when he went to the door.

The defendant "pound[ed]" on the door, and the victim came to the door. The defendant loudly demanded that he be permitted to see the daughter, and he told the victim that he knew what was "going on" and that it was "going to stop right now." He testified that the victim replied, "What if I am? . . . Prove it." The defendant said that he then used his right hand to remove his gun from his holster, which he testified was on his right hip, and pointed it at the victim. He pulled the trigger, although he did not recall where on the victim's body he aimed the gun. He explained that he left the house without the daughter because the reason for his going to get her was "no longer important," and he realized that he had "just made a terrible mistake." He testified that immediately after the shooting he "was so traumatized from the whole situation that [he] honestly could not think clearly." He testified that he could think more clearly before the shooting than he could immediately after the shooting. He agreed that he had been able to explain and

10

recall the events and conversations that preceded the killing and that he was able to point out portions of the son's, Ms. Swaggerty's, and the daughter's testimony that he believed were inaccurate. He also agreed that despite his heavy drinking, he was able to clearly recall details that preceded the killing.

The defendant testified that he wanted to "separate himself" from the shooting of the victim. He testified that he had "just shot a man[,] and [he] just couldn't deal with [it] right there right then" because he had "made a horrible mistake." He testified that he never intended to kill the victim. He returned to the car and told the son to drive, and he denied that he ever asked to go to his office. He also denied telling the son to "act normally" when they passed a police car. The defendant testified that his phone died and that he went to Walmart so that he could obtain a phone charger to report the killing to police. After he purchased the charger, the defendant made several phone calls. He spoke to his mother and told her that he had shot the victim and that she "wouldn't be seeing [the defendant] anymore." The defendant testified that he disassembled the gun while in the passenger's seat. He had the son pull over the vehicle, and he got out of the car and threw the gun into the lake. He said that he disassembled the gun so that another person would not find the gun and kill someone with it. He explained that he wanted to ensure that the gun would not function again.

The defendant recalled going to Mr. Graves's home, and he agreed that he told them that his plan was to "commit suicide by cop," which he explained meant doing "something stupid" after being stopped by a police officer to make the officer shoot him. He spoke with a friend who was a sergeant with the Anderson County Police Department, and he arranged to turn himself in. He testified that he still believed that the victim was molesting the daughter. He testified that he did not tell Mr. Graves that he overheard the daughter having a conversation with her friends during which she said that the victim was molesting her.

The defendant testified that the victim was the first person that he ever accused of molesting the daughter. He denied ever accusing the daughter's grandfather of molesting her, testifying that the daughter's grandmother made that allegation. He denied telling Ms. Swaggerty that the daughter's grandfather was sexually abusing the daughter. He also denied making an allegation of molestation when the daughter was first born. The defendant testified that he was not aware that the victim took the daughter on various day trips for her birthday. He testified that he had never heard the daughter refer to the victim as a second father.

The State called Kellie Martin, Ms. Swaggerty, and the daughter as rebuttal witnesses. Ms. Martin testified that she worked at Applebee's and that she served the

11

defendant on the day of the shooting. She testified that the defendant did not appear to be drunk, and she believed that he could operate a motor vehicle.

Ms. Swaggerty testified that she lived with her mother and father when the daughter was an infant. She stated that the defendant "would call the police and do welfare checks saying [the daughter] was being molested." Ms. Swaggerty testified that the daughter was four or five months old at the time of the calls.

The daughter testified that when she was at her maternal grandmother's house she did not have a conversation with her friends about how she was having sexual intercourse with the victim or how the victim was raping her. She also testified that she did not give the victim a look as if she was having sexual intercourse with him.

At the conclusion of the proof, the jury convicted the defendant of one count of first degree (premeditated) murder and one count of employing a firearm during the commission of a dangerous felony, with attempted first degree murder as the underlying felony. During the hearing on the motion for new trial, the trial court found that because the jury convicted the defendant of first degree murder, they could not also find him guilty of attempted first degree murder in regards to the conviction for employing a firearm during the commission of a dangerous felony. As a result, the trial court vacated the conviction for employing a firearm during the commission of a dangerous felony. The trial court imposed a sentence of life imprisonment for the first degree (premeditated) murder conviction. The defendant filed a timely notice of appeal, and we proceed to consider his claims.

## ANALYSIS

The defendant argues that the evidence was insufficient to support his conviction. He also argues that the trial court erred in admitting jail phone calls between him and his mother, and he contends the trial court erroneously permitted testimony that the defendant had previously accused another person of molesting the daughter.

### I. Sufficiency of the Evidence

The defendant challenges the sufficiency of the evidence of his first degree murder conviction. He argues that he was too intoxicated to form the capacity to commit premeditated murder, and he contends that his belief that the victim molested the daughter created adequate provocation to support a conviction for voluntary manslaughter.

When a defendant challenges the sufficiency of the evidence, the relevant question for this court is "whether, after viewing the evidence in the light most favorable to the State, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "'the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Therefore, this court will not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Instead, it is the trier of fact, not this court, who resolves any questions concerning "the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). This court applies the same standard of review regardless of whether the conviction was predicated on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

First degree premeditated murder is a "premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1) (2010). A premeditated act is one done after the exercise of reflection and judgment, and the intent to kill must have been formed prior to the act. T.C.A. § 39-13-202(d). "It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time." *Id.* However, it must be determined, from an examination of the mental state of the accused, that the accused was sufficiently free from excitement and passion as to be capable of premeditation. *Id.*

Premeditation is a question of fact for the jury's determination. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). It may be established by any evidence which could lead a rational trier of fact to infer that the accused committed the killing after the exercise of reflection and judgment. *Id.* at 615. Courts frequently look to the circumstances surrounding a killing to discern the presence of evidence sufficient to support a finding of premeditation. *State v. Larkin*, 443 S.W.3d 751, 815 (Tenn. Crim. App. 2013).

Factors which tend to support the existence of premeditation include: the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing. *Bland*, 958 S.W.2d at 660. The factors listed in *Bland* are not exhaustive, however. *State v. Adams*, 405 S.W.3d 641, 663 (Tenn. 2013). The nature of the killing

13

or evidence establishing a motive for the killing may also support a conclusion that the crime was premeditated. *Id.* Lack of provocation by the victim, failure to render aid, and destruction or secretion of evidence may also support an inference of premeditation. *Larkin*, 443 S.W.3d at 815-16 (citing *State v. Thacker*, 164 S.W.3d 208, 222 (Tenn. 2005); *State v. Lewis*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000)).

Viewing the evidence in the light most favorable to the State, the defendant was angry with the victim because he believed that the victim molested his daughter. After his interaction with the victim at the daughter's maternal grandmother's home, the defendant made several declarations of his intent to kill the victim. The defendant admitted that he called the victim and threatened to kill him, and the son heard the defendant on the phone telling a person that he would kill him. Ms. Swaggerty overheard the victim's portion of the telephone call, and she ascertained by the victim's responses that the defendant threatened to kill him. The son also testified that the defendant said he was going to give the victim a one-way ticket to heaven and that he would die with the victim. The defendant procured a loaded handgun from his house and later asked the son to drive him to the victim's home. The defendant called the victim and asked to speak to his daughter, and he was rebuffed. Both the son and Ms. Swaggerty testified that the defendant then went to the porch, and Ms. Swaggerty testified that the defendant began pounding on the door. The victim went to the door, and the defendant initiated the argument between the two. After the victim would not allow the defendant to see the daughter, the defendant testified that he removed his pistol from its holster on his right hip and shot the unarmed victim five times. The daughter said that she saw the defendant walking away after the shooting, and the son testified that the defendant returned to the car and said, "Let's go." The defendant did not attempt to contact police after the shooting, and the son testified that when they passed a police car, the defendant told him not to worry and to keep driving. The defendant realized that he needed a phone charger, and he and the son went into Walmart where the defendant purchased a phone charger and a beverage for himself. After making his purchases, the defendant disassembled the gun and threw it into a lake. This evidence was sufficient for the jury could conclude that the defendant acted with premeditation in shooting the victim.

The defendant argues that he was so intoxicated that he was incapable of premeditation and that he should have been convicted of voluntary manslaughter. While voluntary "intoxication itself is not a defense to prosecution for an offense," it "is admissible in evidence, if it is relevant to negate a culpable mental state." T.C.A. § 39-11-503(a). Whether the defendant's intoxication negated his ability to premeditate and form the intent to kill were questions for the jury to consider and resolve. *State v. Vaughn*, 279 S.W.3d 584, 602 (Tenn. Crim. App. 2008). Similarly, whether a "killing resulted from 'a state of passion produced by adequate provocation sufficient to lead a

14

reasonable person to act in an irrational manner' is a jury question." *State v. Williams*, 38 S.W.3d 532, 539 (Tenn. 2001) (quoting T.C.A. § 39-13-211(a)).

Here, the jury resolved both of these questions against the defendant. He contends that the jury unreasonably rejected evidence of the copious amount of alcohol that the defendant consumed on the day of the shooting, including the testimony of several of the State's witnesses. While the defendant testified that on the day of the shooting, he had been drinking all day, and while the daughter and Ms. Swaggerty testified that he appeared drunk during the confrontation in front of Ms. Swaggerty's mother's home, there was also evidence to show that the defendant was not so intoxicated that he was incapable of premeditation. The son testified that the defendant did not appear drunk at the time of the shooting or after the shooting, and he testified that he would know if the defendant was drunk. Similarly, the daughter testified that the defendant did not sound drunk when he was arguing with the victim just before the shooting. Further, the defendant was able to recall the events that led up to and followed the shooting in great detail, even identifying portions of the testimony that he believed were inconsistent with his recollection of the night of the killing. The jury found that the defendant's intoxication did not negate his ability to premeditate and form the intent to kill, and the evidence is sufficient to support that finding. Similarly, the jury heard evidence that the defendant believed that the victim was molesting the daughter. By their verdict of guilty to the charge of first degree (premeditated) murder, the jury necessarily rejected the claim that the defendant acted in "a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." T.C.A. § 39-13-211(a). This question was in the province of the jury, and we conclude that the evidence is sufficient to support the defendant's conviction. He is not entitled to any relief.

## II. Jail Phone Call

The defendant argues that the trial court improperly admitted a recording of a telephone call between the defendant and his mother while the defendant was in jail. He contends that the evidence was irrelevant and prejudicial. The State responds that the trial court properly admitted the recording.

During trial, the State attempted to introduce a recording of a phone call between the defendant and his mother that occurred just after his arrest. The State argued that the phone call was relevant to rebut the defendant's claim that he acted out of concern for his daughter because he did not ask about his daughter during the call. The trial court found that a focal point of the defense was the defendant's concerns regarding child molestation and that the defendant did not say anything about the allegations in the first phone call. The trial court ruled that the evidence was admissible.

15

A trial court's decision to admit evidence will not be reversed absent a showing that the trial court abused its discretion. *State v. Gilliland*, 22 S.W.3d 266, 270 (Tenn. 2000). A trial court has abused its discretion only when it has "applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that caused an injustice to the complaining party." *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008).

In order to be admissible, evidence must first be relevant. *State v. James*, 81 S.W.3d 751, 757 (Tenn. 2002); *see* Tenn. R. Evid. 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Once the court concludes the evidence is relevant, the court should exclude the evidence if its probative value is substantially outweighed by its prejudicial effect. Tenn. R. Evid. 403; *James*, 81 S.W.3d at 757.

Here, a large portion of the defense centered on the defendant's concern that the victim was molesting the daughter and his claim that he acted to protect her. As a result, the evidence showing that he did not ask about her welfare in his first phone call from jail was relevant to rebut his contention that he acted only out of concern for his daughter and was relevant to show that he acted with premeditation in shooting the victim. While the phone calls reveal that the defendant was in jail, the son had previously testified, without objection, that the defendant planned to turn himself in to authorities the morning after the shooting. Further, the defendant was incarcerated for the crimes for which he was on trial, and the incarceration was not the result of unrelated charges or other criminal activity. *Cf. State v. Spike Hedgecoth*, No. E2002-01869-CCA-R3-CD, 2003 WL 22668873, at *3-4 (Tenn. Crim. App. Nov. 12, 2003) (concluding that admission of phone calls when the defendant was incarcerated on charges unrelated to the charges for which he was on trial and revealed that he was incarcerated was harmless error). The probative value of this evidence was not substantially outweighed by its prejudicial effect, and we conclude that the trial court did not abuse its discretion in admitting the evidence. The defendant is not entitled to any relief.

### III. Prior Allegations of Molestation

The defendant argues that the trial court erred when it permitted the State to introduce evidence that the defendant had previously accused someone other than the victim of molesting the daughter. First, he contends that the evidence was more unfairly prejudicial than it was probative of the defendant's credibility. Second, he contends that if the evidence was admitted pursuant to Tennessee Rule of Evidence 404(b), its only purpose was to show that the defendant acted in conformity with a character trait. The

16

State responds that the evidence was not admitted under Rule 404(b) and that the trial court properly admitted the evidence.

During the direct examination of Ms. Swaggerty, the State requested to ask her whether the defendant had previously made accusations that someone was molesting the daughter. During a bench conference, the State argued that the evidence was relevant to the credibility of the defendant. The defendant objected on the basis that Ms. Swaggerty's answer might be that "something happened 15 years ago." The trial court asked whether a police report had been completed regarding the allegation, and the prosecutor responded that there was not a police report. The trial court stated that the allegation would become "a prior bad act of false accusations," and the court found that the danger of unfair prejudice outweighed the probative value.

After the defendant testified, the prosecutor approached the bench to ensure that it was permissible for her to ask the defendant about "prior allegations" on cross-examination. The trial court asked whether these were prior allegations that the daughter was sexually abused, and the prosecutor responded affirmatively. The prosecutor and trial counsel then engaged in a brief exchange in which trial counsel asked whether the prior allegation involved the daughter's grandfather. The State responded "[y]es," and trial counsel asked, "There was one?" The trial court then answered "[y]eah," and the bench conference was concluded.[1] At no point during the bench conference did the defendant object to the line of questioning. The State proceeded to cross-examine the defendant about prior accusations, and he denied making the allegations. At the conclusion of his testimony, the State called Ms. Swaggerty as a rebuttal witness and asked her about prior accusations that the defendant made. She testified that when she lived with her parents and the daughter was an infant, the defendant would call the police and claim that the daughter was being molested.

As stated above, a trial court's decision to admit evidence will not be reversed absent a showing that the trial court abused its discretion. *Gilliland*, 22 S.W.3d at 270. A trial court has abused its discretion only when it has "applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that caused an injustice to the complaining party." *Banks*, 271 S.W.3d at 116.

We conclude that the defendant has waived any 404(b) argument and that the trial court properly admitted the evidence. While the trial court appeared to exclude the

---

[1] It is unclear whether this response was to the prosecutor's question of whether the questions about the prior allegations were admissible or whether it was in response to trial counsel's question of whether there was a prior allegation of molestation against the daughter's grandfather.

evidence of the prior allegations based on Rule 404(b) during Ms. Swaggerty's direct examination, the defendant did not renew any 404(b) objection when the State cross-examined him. As a result, he has waived any issue regarding the admission of the evidence under Rule 404(b). *See* Tenn. R. App. P. 36(a). Further, the rebuttal testimony of Ms. Swaggerty was not admitted as substantive evidence but was instead admitted for impeachment purposes. By testifying and denying the allegations, the defendant placed his credibility at issue. As a result, the State was entitled to introduce the testimony of Ms. Swaggerty to impeach the defendant's credibility. *See* Tenn. R. Evid. 613 (permitting the introduction of extrinsic evidence of a prior inconsistent statement of a witness after the witness has been given the opportunity to explain or deny the statement). We conclude that the trial court did not abuse its discretion in admitting the testimony, and the defendant is not entitled to any relief.

## CONCLUSION

Based on the foregoing analysis, we affirm the judgment of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE